## THE ETNA.
### MITCHELL v. THE ETNA et al.
#### No. I.

District Court, E. D. Pennsylvania.
Jan. 30, 1942.

Howard M. Long and Raymond Pace Alexander, both of Philadelphia, Pa., for libellant.

John B. Shaw, of Krusen, Evans & Shaw, all of Philadelphia, Pa., for respondents.

BARD, District Judge.

This is an action in admiralty to recover damages sustained by libellant, a stevedore, while engaged in unloading a cargo from the Steamship "Etna".

I make the following special

### Findings of Fact.

1. On April 15, 1940, the date of the accident, libellant was a stevedore employed by the Jarka Corporation, and was engaged in unloading a cargo of wood pulp from the No. 1 hold of the Steamship "Etna", at Philadelphia, Pennsylvania.

2. The cargo in the forward part of the No. 1 hold was destined for Wilmington, Delaware, and the cargo in the after part was destined for Philadelphia.

3. Libellant was injured when bales of wood pulp in the rearmost tier of the cargo destined for Wilmington collapsed and fell upon him.

4. The collapse of these bales resulted from improper and negligent stowage of the Wilmington cargo when loaded in Sweden.

5. Because of high seas and head-winds encountered by the Steamship "Etna" on her voyage from Sweden to Philadelphia, her master knew, or had reason to know, that the cargo in the No. 1 hold might be insecure and in danger of collapse.

6. There was nothing in the appearance of the rearmost tier of the Wilmington cargo which revealed to libellant its improper stowage and danger of collapse.

7. Libellant was not advised by the master of the Steamship "Etna" of the possible insecurity and danger of collapse of the Wilmington cargo.

8. The accident occurred through no fault of the libellant.

9. Libellant received multiple fractures of the right leg, comminuted fracture of the left leg, and multiple fracture of the pelvis.

10. He remained in bed for about four months, after which he was able to walk only with the assistance of a crutch and a cane.

11. He has permanent limitation of motion in the ankle joints, and can never resume work as a stevedore or do any other heavy work.

12. At the time of the accident he was fifty-four years old and had been employed as a stevedore for thirty-two years.

13. His earnings were approximately $2,400 per year during the four or five years immediately prior to the accident.

14. As a result of the injuries sustained by libellant, he is permanently incapacitated from performing his customary and usual occupation and duties as a stevedore and from doing any other heavy work.

### Discussion.

On April 15, 1940, libellant was employed as a stevedore by the Jarka Corporation and was engaged in discharging a cargo of wood pulp from the Swedish Steamship "Etna", one of the respondents. He and several fellow stevedores were assigned to unloading the No. 1 hold. The entire forward part of this hold contained wood pulp destined for Wilmington except for the three top layers which were to be unloaded at Philadelphia, as was also the wood pulp stowed in the after part of this hold. The pulp was stored in bales weighing about 350 pounds each. The method of discharge was for the stevedores to insert into the binding of the bales hooks which were fastened to a tackle which led from a boom located over the No. 1 hatch. Approximately eight bales were hoisted at a time by means of this boom and swung onto the wharf.

Libellant and his fellow stevedores had begun to work at about eight o'clock in the morning of the accident. They had discharged the Philadelphia cargo, which had been on top of the Wilmington cargo, and had discharged in the after part of the hold to a depth of approximately eight bales below the top of the Wilmington cargo. There was no bulkhead between the Wilmington cargo and the Philadelphia cargo, but the rearmost tier of the former was stowed evenly and appeared to serve as a firm and solid bulkhead. At about 2:15 in the afternoon a draft of cargo had just been removed and libellant was about to fasten the hooks in other bales when this rearmost tier of the Wilmington cargo broke from the middle and a number of bales fell on libellant, inflicting the very serious injuries referred to in the findings of fact.

The evidence on behalf of libellant showed that the bales of pulp forward of the rearmost tier of the Wilmington cargo were not at the time of the accident evenly stowed, but appeared to have been thrown in at an angle and contained spaces which permitted them to shift and work back. The evidence also showed that there was little or no dunnage between the bales to hold them firmly in place. I have concluded that as a result thereof some of the forward bales pressed back against the rearmost tier of the Wilmington cargo and dislodged the bales in that tier, causing it to collapse and fall on libellant. This conclusion is further supported by evidence that when the tier collapsed it broke from the middle and then the bales above came toppling down.

Respondents argue that there is no evidence of negligence on the part of the ship or her owners, and that the doctrine of res ipsa loquitur is inapplicable because at the time of the accident they were not in possession or control of the instrumentality. They rely on the fact that libellant and his fellow stevedores were in the employ of Jarka Corporation, an independent contractor, which was in control of discharging the cargo from the No. 1 hold as well as from the other holds of the ship. They suggest that the cause of the collapse of the cargo was the probable striking of the Wilmington cargo by drafts of the Philadelphia cargo as it was swung forward from the after part of the hold to the point beneath the hatch from which it was hoisted and removed. There is, however, no evidence to support this last supposition, and the testimony on behalf of the libellant uniformly and explicitly negatives it.

I agree with the contention of the respondents that the doctrine of res ipsa

loquitur is inapplicable in the situation presented by this case, but I believe that the libellant has produced sufficient evidence of negligence, in addition to the happening of the accident, to carry the burden of proof upon him. This evidence has been referred to above, but a reference to further facts may present a more complete picture.

In January of 1940 the Steamship "Etna", with a cargo of wood pulp, sailed from Sweden. She was convoyed by the Swedish Navy within the three-mile limit because of German mine fields, and sustained damage to her bottom and propellers as a result of striking ground. The cargo from her No. 1 hold was thereupon removed and shipped by rail to Landskrona. The vessel was repaired and sailed to Landskrona, where the cargo of No. 1 hold was reloaded. After reloading, the "Etna" sailed for Philadelphia and experienced such heavy seas and bad weather that on the date of her arrival, April 15, 1940, the captain signed a protest before a notary public that the vessel "experienced high seas and head-winds—ship laboring most of the voyage and the appearer apprehending damage or loss notes this protest accordingly."

It was on the same day that the discharge of the cargo began and the accident to libellant occurred. The witnesses who saw the condition of the cargo forward in the No. 1 hold testified that it appeared to have been stowed at angles and with spaces and that it was not stowed evenly or held securely in place by adequate dunnage. Such a condition could have resulted only from improper and negligent stowage because this portion of the cargo was not being unloaded by the stevedores and could not have been thus disturbed by them. Although the captain of the "Etna" testified that the loading at Landskrona was done by experienced stevedores, he further testified that he looked down into the No. 1 hold after the accident, but neither he nor any other witness on behalf of respondents contradicted the testimony of libellant's witnesses as to this condition of the forward cargo. Moreover, if the captain had sufficient cause to believe that the ship had encountered so rough a voyage that the disturbance of the cargo might have injured the said cargo, he should have been equally alert to possible injury to stevedores as a result of such disturbance.

It is argued by respondents that since the unloading of the ship had been undertaken by the Jarka Corporation, an independent contractor, that company alone had the duty of seeing to the safety of its employees, and it was the failure of the Jarka safety man to lash up the Wilmington cargo which resulted in the accident to libellant. The evidence shows, however, that the rearmost tier of the Wilmington cargo appeared to be stowed evenly and firmly and neither the libellant nor his employer had cause to believe that the forward cargo had not been evenly and properly stowed.

With respect to the duty of the respondents, it is established that the owner of a vessel owes to stevedores engaged upon the vessel, even though they be employed by an independent contractor, the duty of exercising reasonable diligence to furnish a safe place in which they may perform their services, and to notify them of any latent dangers or defects in the vessel. Grays Harbor Stevedore Co. v. Fountain, 9 Cir., 5 F.2d 385; The Chicago, D.C., 156 F. 374. It is likewise recognized that the master of a vessel has the duty of seeing that the cargo is properly stowed, Carter v. Brown, 5 Cir., 212 F. 393, and, where an injury occurs to a stevedore unloading a cargo as a result of negligent loading, the ship and her owner cannot escape liability by showing that the loading was done by an independent contractor who employed competent stevedores. Munson S. S. Lines v. Newman, 5 Cir., 24 F.2d 416. In the case at bar, therefore, the ship and her owner are responsible for the improper and negligent stowage of the cargo which resulted in the injury to the libellant.

There remains only the question of damages. There is no conflict as to the injuries received by libellant, or as to their seriousness. Under all the evidence, I fix damages in the amount of $12,000.

### Conclusions of Law.

1. The proximate cause of the injury to libellant was the negligence of the respondents in permitting careless and unsafe stowage of cargo in the No. 1 hold of the Steamship "Etna".

2. The owners of a ship are responsible for injuries to a stevedore in the employ of an independent contractor resulting from an unsafe condition in a part of the ship where he is required to work.

3. The owners of a ship are responsible for injuries caused by improper and negli-

gent stowage of a cargo, even if the stowage be done by a competent independent contractor.

4. The doctrine of res ipsa loquitur is inapplicable in this case because the instrumentality causing the injury was not at the time of the accident in the exclusive control of the ship's owner.

5. Libellant was free from contributory negligence.

6. The libel is sustained and damages of $12,000 are awarded to the libellant.