Jose H. **RAMIREZ** and Ernest Guerrero, Plaintiffs,

v.

**TOKO KAIUN K.K.,** a Foreign Corporation, Defendant.

**No. C–73–2272 WHO.**

United States District Court, N. D. California.

Nov. 21, 1974.

Kay & Solvin, Francis J. Solvin, Van H. Pinney, San Francisco, Cal., for plaintiffs.

Lillick, McHose, Wheat, Adams & Charles, Tristam B. Brown, James R. Thompson, San Francisco, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER

ORRICK, District Judge.

This case presents for the first time in this Circuit the effect of the 1972 Amendments[1] (which became effective November 26, 1972, and are hereinafter called the "Amendments") to the Longshoremen's and Harbor Workers' Compensation Act[2] (the "Act") upon the standard of care owed to longshoremen employed by an independent stevedore

1. Act of October 27, 1972, Pub.L.No.92–576, 86 Stat. 1263.

2. 33 U.S.C. § 901 et seq.

contractor doing work upon a vessel owned by a third party. This Court has jurisdiction pursuant to 28 U.S.C. § 1333 and The General Maritime Law.

■ For the reasons hereinafter discussed, I hold that under the Amendments the defendant ship owner owes to the plaintiffs longshoremen the same standard of care that a land-based owner of a premises owes to a business invitee (See Restatement (Second) of Torts § 343A (1965)). In this instance, the ship owner must (1) exercise ordinary care to place the ship and equipment in such condition that an experienced stevedore will be able, when exercising ordinary care, to discharge the cargo in a workmanlike manner and with reasonable safety to persons and property, and (2) give the stevedore warning of any concealed or latent defects that are known by the shipowner.[3] This standard will be applied to the following facts:

## I. FACTS

On May 9, 1973, the M. S. *Toten Maru,* a cargo ship owned by defendant, Toko Kaiun K.K., docked at the 9th Avenue Pier in Oakland, California. On that day the cargo, primarily steel pipe, was inspected by an independent cargo appraiser, and the cargo was certified to have been safely stowed. The unloading operations were turned over to Marine Terminals Corporation ("Marine Terminals"), an independent stevedore contractor who is not a party to this action.[4] Marine Terminals assumed complete control of the unloading; there is no evidence that any member of the crew or other employee of Toko Kaiun K.K. was in any way involved in the operation.

### A. *Method of Unloading*

Stevedoring "gangs" from Marine Terminals commenced unloading the night of May 9, but on the morning of May 10 the operation was not yet completed. On that morning plaintiffs, Ramirez and Guerrero, both "A-men", experienced longshoremen, reported for work at Marine Terminals and were assigned to the "gang" who were to work the No. 3 hatch. This gang consisted of six men, including Ramirez, Guerrero, and the two less-experienced "B-men", to work in the hold. In addition to the "hold men", the gang was assigned a "hoist man" who worked the crane-like boom and winches, and a "hatch tender" whose job it was to relay signals between the men in the hold and the hoist operator, as these men could not see each other. There was also a "gang boss" who supervised the work of the gang to see that they were working properly and safely. This gang boss was supervised by a "walking boss", who, in turn, was responsible to the "cargo superintendent." All members of the gang, as well as the gang boss, walking boss and cargo superintendent, were employed by Marine Terminals.

Before the gang began working that morning, the gang boss made a further inspection of the hold. He described the hold as large, approximately 40 feet by 30 feet, and open, allowing good illumination of the cargo all day. The cargo consisted of two large piles of pipe, some to be unloaded for the San Francisco area and some that was destined for Los Angeles that was to remain with the ship. At the time of his inspection, the pile to be unloaded in Oakland was not level due, among other things, to the fact that previous gangs had already unloaded a portion of the pile in a manner that left it uneven. The pipes were not all of the same type. Most of the pipes were loose, although some were in bundles. The evidence was not clear as to the exact size of the pipes, but it appears that there were

---

3. See Hugev v. Dampskibsaktieselskabet International, 170 F.Supp. 601 (S.D.Cal.1959), *infra.*

4. Under the provisions of the Act, plaintiffs only recourse against Marine Terminals lies in their Workmen's Compensation claim. 33 U.S.C. § 905(a) (Supp.1974), *amending* 33 U.S.C. § 905 (1970).

several different diameters from 1 to 8 inches mixed together, and the lengths were between 20 and 40 feet. All of the pipe was coated with oil to prevent rust, making them slippery and hard to handle. The pipe was loaded in a manner known as a "solid block stow", that is, there were no layers separated with wooden blocks or dunnage that would make the unloading easier. The ends of the pipe were not even; the pipe was stowed so that some of the ends protruded further than others. These conditions continued unchanged throughout the unloading that day, and no new hazards were uncovered as the men worked down through the pile. The men complained to the gang boss about these conditions, and this complaint was forwarded to the walking boss and cargo superintendent. The men were told to do the best they could, and no adjustments were made, nor were any complaints made to any member of the ship's crew.

The method chosen by Marine Terminals to unload the *Toten Maru* required the use of the ship's winches, boom and main cable. This equipment functioned normally throughout the procedure. The end of the ship's cable contained a large spherical swivel to which earlier Marine Terminals' employees had attached the rigging, or "bridle", used to unload the pipes. All of the bridles, cables, wire and hooks used to attach the pipes to the line of the hoist were supplied and attached by Marine Terminals. The basic arrangement consisted of four large cables each attached at one end to the swivel and at the other end to one of four hooks. This bridle was suspended from the hoist with the four hooks dangling, and was raised, lowered and moved from side to side by the hoist man in response to signals from the men in the hold.

The men in the hold were required to work on top of the pile of pipes to be unloaded. Ramirez and Guerrero had to kneel near the edge of the pipes and thread a ½ inch cable about 10 feet long, called the "pick-up wire", under the ends of the pipes about 2 feet down the stack. The ends of this pick-up wire were then attached to two of the four hooks on the bridle. When the pick-up wire was secure, Ramirez signaled to the "hatch man" who relayed the signal to the hoist man, and the ends of the pipes were raised about three feet. The pipes then had one end suspended by the pick-up wire and the other resting on the pile. The purpose was to separate a bundle of pipes approximately three feet in diameter from the pile long enough for Ramirez and Guerrero to whip two larger cables between the pipes now raised at an angle and the rest of the pile. Ramirez and Guerrero would then hand one of these cables to the B-men to put in place as far down toward the low end as possible. After the B-men had positioned their cable, Ramirez and Guerrero would then place the other cable in a corresponding position under the high end of the pipes. When the two cables were in position, Ramirez would signal the hatch tender, and the pipes were lowered onto these cables. The pick-up wire was then removed and the main cables were attached to the four hooks of the bridle. Another signal was given and the pipes were raised up and out of the hold.

### B. *The Accident*

The men had been working in this manner without incident from 8:00 a. m. in the morning until 2:30 p. m. in the afternoon when the accident occurred. At the most precarious point in the operation, when the pipe was suspended at an angle by the pick-up wire and the men were attempting to position the main cables, the load of pipe "spilled", and a bundle of pipes landed on plaintiff Guerrero's foot. The pick-up cable flew off the hooks, and the bridle, relieved of its load, began spinning wildly. One of the whirling hooks struck plaintiff Ramirez in the chest, knocking him on his back. Neither man was seriously hurt, and both were able to climb out of the hold under their own power. They filled out accident reports, then took a taxi to the hospital where

they were examined and released. Both were unable to return to work for approximately ten weeks.

The precise cause of the accident was never satisfactorily established at the trial. It was clear, however, that the unloading operation required skillful workmanship by each member of the gang to be successful. The boom must be positioned, "spotted", correctly for each load. The "purchase", or angle at which the pick-up wire joins the pipes must be correct. The "A-men" must choose an appropriate number of pipes when threading the pick-up wire. Failure to perform any of these operations correctly can cause the load to spill. It is normal for the ship to vibrate from the hoist engines and to move as a result of waves or the discharge of cargo by gangs in other holds. On the day in question, the bridle hooks supplied by Marine Terminals were designed with safety clips to prevent the cables from slipping off after they have been attached. These clips had been removed by Marine Terminals. Also, there was evidence that the method chosen by Marine Terminals to unload was not the safest that could have been employed. Had the men been supplied with wooden blocks, these blocks could have been used as "on-the-spot dunnage". With on-the-spot dunnage, the pipe is raised only a few inches with the pick-up wire thus reducing the danger of "spilling". Once the pipe ends are lifted enough, dunnage is slipped under, and the main cables can be positioned while the pipes are resting safely on the dunnage. All witnesses agreed that it was the responsibility of the stevedore company, and not the ship, to provide on-the-spot dunnage.

It is true that if the pipe had been stowed in layers separated by dunnage, that the unloading would have been safer. This method of using dunnage is often employed in U. S. ports. Also, plaintiffs suggested that the load could have been "pre-slung", loaded in bundles already wrapped in cables, obviating the need for the pick-up wire technique.

Plaintiffs did admit, however, that the "solid block stow" utilized in the *Toten Maru* is the most common manner in which the pipe arriving in this port is stowed and that pipes stowed identically to those in hatch No. 3 are regularly unloaded safely. Furthermore, the stow in hatch No. 3 was inspected several times, and each time was proclaimed to be safe to unload. It was admitted that by union policy "each man is a safety committee" and can stop an unloading procedure if he feels that an unsafe condition has developed, yet at no time prior to the accident did these experienced longshoremen stop the unloading of hatch No. 3, nor was the unloading stopped by any of the supervising employees of Marine Terminals.

## II. LEGAL EFFECT OF THE AMENDMENTS ON THE REMEDIES FOR LONGSHOREMEN

### A. *Remedies Available Before the Amendments*

Before deciding how Congress intended the Amendments to apply to the facts in the case at bar, an understanding of the pre-amendment course of the law is helpful. Throughout this century, there has been some conflict between Congress and the courts over how best to remedy the problem of longshoremen's injuries. The courts first extended protection to the longshoreman by allowing him to sue in admiralty. Atlantic Transportation Co. v. Imbrovek, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914). This opened the door for inclusion of longshoremen under the liberal remedies of the Jones Act (46 U.S.C. § 688 (1958)). International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926). At about the same time, the courts closed the door to state workmen's compensation claims by the longshoremen (Southern Pacific Co. v. Jensen, 244 U. S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917)), reasoning that the need for uniformity in maritime matters prohibited piecemeal protection by the states. Congress twice tried unsuccess-

fully to challenge this holding and bring the longshoremen within state workmen's compensation plans, but the courts held these attempts to be unconstitutional. See Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920) and Washington v. W. C. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924). Seeing the light and determined to include the longshoremen under some workmen's compensation plan, Congress passed the original Longshoremen's and Harbor Workers' Compensation Act. Act of March 4, 1927, Pub.L. No. 69–803, codified at 33 U.S.C. § 901 et seq. (1970). This was to be the sole remedy of the longshoreman against his employer, abolishing the Jones Act recovery granted to the longshoremen by International Stevedoring Co. v. Haverty, *supra.* See Swanson v. Marra Brothers, Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946). However, the Act allowed the longshoreman to retain his admiralty action against the vessel. Act of March 4, 1927, Pub.L. No. 69–803, § 33, 44 Stat. 1440. The courts expanded this remedy against the vessel, primarily through extending the doctrine of "unseaworthiness." In the landmark case of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Supreme Court first held that longshoremen were entitled to the protection of the judicially created warranty of seaworthiness. In the intervening years this concept was expanded to the point that it had nearly become a doctrine of absolute liability. See H.R.Rep. No. 92–1441, 92d Cong., 2 Sess. 4–5 (1972), S.Rep. No. 92–1125, 92d Cong., 2d Sess. 8–9 (1972), U.S.Code Cong. & Admin. News, p. 4698.

Under the doctrine of seaworthiness, the vessel became liable to the injured longshoreman even in cases in which the stevedoring company which employed the longshoreman was at fault by employing an improper method of unloading cargo. See, e. g. Blassingill v. Waterman S.S. Corp., 336 F.2d 367 (9th Cir. 1964). It may well be that the plaintiff in this case could have established a cause of action under the unseaworthiness standard. In Gindville v. American-Hawaiian S.S. Co., 224 F.2d 746 (3d Cir. 1955), a longshoreman recovered for a similar accident in the unloading of pipe. See also, Amador v. A/S J. Ludwig Mowinckels Rederi, 224 F.2d 437 (2d Cir. 1955), cert. den. 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 791 (1955); Palazzolo v. Pan Atlantic S. S. Corp., 211 F.2d 277 (2d Cir. 1954), aff'd sub nom. Ryan Stevedoring Co. v. Pan Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

The Supreme Court in Ryan Stevedoring Co. v. Pan Atlantic S. S. Corp., *supra,* provided relief for the vessel in situations in which the injury was due to the negligence of the stevedoring company by allowing the vessel to sue the stevedoring company for redemption on the theory that the stevedoring company had breached its implied warranty of workmanlike performance. The Court held that this triangular suit did not violate the exclusive liability provision of 33 U.S.C. § 905 (1970), even though it allowed the longshoreman to recover indirectly from his employer more than could be recovered directly through a workmen's compensation claim.

The triangular suit allowed by the *Sieracki* and *Ryan* cases, *supra,* provided greater protection and increased benefits to the longshoremen, but it did so at the expense of increased litigation costs and considerable expenditure of court time.

### B. The Amendments

*1. The Reason for the Amendments.*

■ The main reason for the Amendments was to obviate the increased litigation costs and the unwarranted expenditure of court time under the old system. The House Committee noted this waste of resources when the Amendments were considered:

"The Committee heard testimony that the number of third-party actions brought under the *Sieracki* and *Ryan*

line of decisions has increased substantially in recent years and that much of the financial resources which could better be utilized to pay improved compensation benefits were now being spent to defray litigation costs." H.R.Rep. No. 92–1441 92d Cong., 2d Sess. 5 (1972), U.S.Code Cong. & Admin.News, p. 4702.

The Senate Report concurred (S.Rep. No.92–1125, 92d Cong., 2d Sess. 9 (1972)), and added:

"The social costs of these law suits, the delays, crowding of court calendars and the need to pay for lawyers' services have seldom resulted in a real increase in actual benefits for injured workers." Id. 4.

Congress concluded that the judicially created protection in the *Sieracki/Ryan* line of cases was not viable and fashioned an alternative in the 1972 Amendments. A tradeoff was made by Congress in an attempt to balance the interests of all parties involved. Under the plan as formulated by Congress, the longshoreman lost his claim against the vessel under the warranty of seaworthiness allowed by *Sieracki*, and in return was granted much higher compensation benefits. The stevedoring company that employs the longshoreman was forced to pay the higher workmen's compensation benefits, but was relieved of liability from *Ryan*-type indemnity suits brought by the vessel. The vessel lost its indemnity rights against the stevedoring company, but had its liability to longshoremen limited to cases where its negligence can be proved. Act of October 27, 1972, Pub.L. No. 92–576, § 18, 86 Stats. 1263, amending 33 U.S.C. § 901 et seq. (1970).

■ The only question left to the courts under the statutory plan presented by the Amendments is the scope of the longshoreman's remedy against the vessel under the new negligence standard. The statute merely abolishes the seaworthiness doctrine, but says nothing about the extent of the remedy to follow. The legislative history makes clear that Congress intended that whatever standard be applied, it should be applied uniformly throughout the nation:

"Finally, the Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located." H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 8 (1972); S.Rep. No. 92–1125, 92d Cong., 2d Sess. 12 (1972), U.S.Code Cong. & Admin.News, p. 4705.

This national standard is consistent with the concern of the Supreme Court in establishing a uniform standard in such cases. Southern Pacific Co. v. Jensen, *supra*.

2. *The Purpose of the Amendments.*

Although the 1972 Amendments only specifically abolished the seaworthiness standard, the Committee reports make clear that Congress meant also to abolish all related special admiralty standards of care, including the nondelegable duty to provide a safe place to work:

"The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness', 'nondelegable duty', or the like.

\*  \*  \*  \*  \*  \*

Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work." H.R.Rep.No. 92–1441, 92d Cong., 2d Sess. 6 (1972); S.Rep. No. 92–1125, 92d Cong., 2d Sess. 10 (1972), U.S.Code & Admin.News, p. 4703.

### 3. *The Standard of Care Required by the Amendments.*

To formulate the standard of care required under the Amendments, the Court must look to land-based standards, yet as there must be a uniform national standard, the Court must not be bound by the law of any particular state. The treatises agree that the duty to supply a safe place to work to a business invitee is limited to warning him of latent defects:

> "Likewise, in the usual case, there is no obligation to protect the invitee against dangers which are known to him, or which are so obvious and apparent to him that he may reasonably be expected to discover them." W. Prosser, Law of Torts, p. 403 (3d Ed. 1964) (footnotes omitted).

See, also, Restatement (Second) of Torts § 343A (1965); 65 C.J.S. Negligence § 63(53). This standard has been followed consistently in other maritime jurisdictions,[5] and by this Circuit in applying state law [6] and in early longshoremen cases before the introduction of the seaworthiness doctrine.[7]

In this Circuit, the Court of Appeals has specified the duty owed by a vessel to provide a safe place to work in a case where the seaworthiness doctrine was held to be inapplicable. In Huge v. Dampskisaktieselskabet International, 170 F.Supp. 601 (D.C.Cal.1959), aff'd sub nom. Metropolitan Stevedore Co. v. Dampskisaktieselskabet International, 274 F.2d 875 (9th Cir. 1960), the *court was faced with an injury to a longshoreman during unloading operations.* The vessel was held liable to the longshoreman through the doctrine of seaworthiness, but the court held that the seaworthiness doctrine was inappropriate in the third party suit between the vessel and the stevedoring company. In the context of this third-party suit to decide who should be ultimately responsible for the injuries suffered by the longshoreman, the court, in a well-reasoned opinion, discussed the extent of the duty owed by the vessel to provide a "safe place to work". The court noted that after a long voyage in which the ship and its cargo have been exposed to the unpredictable conditions of the open seas, it would not be reasonable to expect that the ship be a safe place in which to work. The court then proceeded to formulate the standard of care owed by the vessel:

> "(1) to exercise ordinary care under the circumstances to place the ship on which the stevedoring work is to be done, and the equipment and appliances aboard ship, in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care under the circumstances to load or discharge the cargo, as the case may be, in a workmanlike manner and with reasonable safety to persons and property; and (2) to give the stevedoring contractor reasonable warning of the existence of any latent or hidden danger which has not been remedied and is not usually encountered or reasonably to be expected by an expert and experienced stevedoring company in the performance of the stevedoring work aboard the ship, if the shipowner actually knows or, in the exercise of ordinary care under the circumstances, should know of the existence of such danger, and the danger is one which the shipowner

5. Hite v. Maritime Overseas Corp., 380 F. Supp. 222 (E.D.Tex.1974) at 226–227 n. 9 and cases assembled therein.

6. U. S. v. Trubow, 214 F.2d 192 (9th Cir. 1954) (Calif. law); DeVille v. Shell Oil Co., 366 F.2d 123 (9th Cir. 1966) (Alaska law); Poston v. U. S., 396 F.2d 103 (9th Cir. 1968) cert. den., 392 U.S. 946, 89 S.Ct. 322, 21 L.Ed.2d 285 (1968), rehearing den., 393 U.S. 1072, 89 S.Ct. 724, 21 L.Ed.2d 717 (1969) (Hawaii law).

7. See Grays Harbor Stevedore Co. v. Fountain, 5 F.2d 385 (9th Cir. 1925); Jensen v. Bank Line, 26 F.2d 173 (9th Cir. 1928); The Clan Graham, 163 F. 961 (D.C.Ore. 1908).

should reasonably expect a stevedoring contractor to encounter in the performance of the stevedoring contract." 170 F.Supp. at 610–611.

It must be noted that the standard discussed in the *Hugev* case was for an action based in contract between the vessel and the stevedore company. The Court cannot say that in every case in which the vessel would have been able to succeed in an indemnity suit against the stevedoring company the vessel will now be able to defend successfully against the injured longshoreman. The situations, however, are analogous, and should be a good indication of the standard of care to be demanded of the vessel under the Amendments.

■ Even before the Amendments it was established in this Circuit that a plaintiff longshoreman in an action based on negligence rather than seaworthiness must not only show a dangerous or defective condition that contributed to his injury, but also he must bear the burden of establishing some duty on the part of the vessel to discover and remedy the condition. Partenweederei, M. S. Belgrano v. Weigel, 299 F.2d 897 (9th Cir. 1962). In *Belgrano*, the injury was caused by a faulty boom which fell on the dock, striking the plaintiff. The appellate court overturned the district court's finding of unseaworthiness by holding that the plaintiff was not doing the work of a seaman and was not injured while on the vessel. The appellate court also held that the alternate grounds for relief—negligence in not discovering and correcting the danger and in not providing a safe place to work—were also deficient in that plaintiff had established no duty to inspect or remedy the defective condition. As in *Belgrano*, the plaintiff in the case at bar has not fulfilled his burden of showing some duty on the part of the defendant to discover and correct the alleged defective condition.

In establishing the extent of liability under the Amendments, the Court was furnished with several recent district court opinions in other circuits dealing with the effect of the Amendments.[8]

In each case, the district court interpreted the Amendments as placing on the vessel the duty only to warn of latent defects and rejecting any non-delegable duty to provide a safe place to work. In Lucas v. "Brinknes" Schiffahrts, 379 F. Supp. 759 (E.D.Pa.1974), a three judge panel was convened to consider the many cases pending under the Amendments in that district. This panel, after an exhaustive review of the history of the Act, said of the duty to provide a safe place to work:

"In providing for the third-party suit against the vessel for its negligence, Congress perceived that it was eliminating the large number of cases in which the vessel was held liable without fault pursuant to the doctrine of seaworthiness. This perception was based on the assumption that the negligence remedy provided would be similar to the common law concept based on fault and not any maritime negligence concept in which the vessel owed some special duty to provide the longshoreman a safe place to work." *Id.* 379 F.Supp. 767. Quoted with approval in Slaughter v. S.S. Ronde, *supra,* slip opinion at 15.

In Hite v. Maritime Overseas Corp., 380 F.Supp. 222 (E.D.Tex.1974), the court held that there was no duty to warn the longshoreman of any obvious defects on the ship. In Fedison v. Wislica, Civil No. 73–1030, 382 F.Supp. 4 (E.D.La. 1974, supp. mem. opinion, September 19, 1974), a longshoreman was injured when he fell into a gap or hole between the crates in the stow. Judge Heebe, in dismissing the plaintiff's suit, stated:

"1. The plaintiff seeks to hold the vessel liable for the condition of the

---

8. Slaughter v. S.S. Ronde, Civil No. 3151 (S.D.Ga. Sept. 11, 1974) ; Hite v. Maritime Overseas Corp., *supra,* n. 5; Lucas v. "Brinknes" Schiffahrts Ges. Franz Lang G.m.b.h. & Co., K.G., 379 F.Supp. 759 (E.D.Pa.1974) ; Fedison v. Wislica, Civil No. 73–1030, 382 F.Supp. 4 (E.D.La.1974), supp. mem. opinion, September 19, 1974.

stow, alleging that the defendant breached [his] duty to provide him with a safe place to work. By this argument, however, the plaintiff seeks to circumvent the expressed intent of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), to abolish actions by longshoremen against the vessel based upon a breach of warranty of seaworthiness." 382 F.Supp. at 6.

Judge Heebe went on to hold that it was the responsibility of the stevedore, which had control over the work being done, to discover and remedy any dangerous condition that existed in the stow.

## III. APPLICATION OF THE AMENDMENTS TO THE CASE AT BAR

Plaintiff argues only one theory upon which negligence can be found on the part of the ship owner rather than the stevedoring company: that the method of stow violated defendant's duty to provide a "reasonably safe place to work". Plaintiff stresses most strongly that the ship owner was negligent in providing a ship whose cargo of pipe was not evenly stacked. The uneven ends, it is urged, renders the pick-up wire technique unreasonably dangerous.

■ Plaintiff argues that the duty owed by the vessel to the longshoreman under the negligence standard should include a non-delegable duty to provide a "reasonably safe place to work". Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Lusich v. Bloomfield S.S. Co., 355 F.2d 770 (5th Cir. 1966). This nondelegable duty, the argument continues, extends to the method of cargo stowage. Munson S.S. Lines v. Newman, 24 F.2d 416 (5th Cir. 1928); The Etna, 43 F.Supp. 303 (E.D.Pa.1942). Even if such a standard were adopted, the Court finds that on the facts of this case, the duty would not have been breached. The testimony consistently demonstrated that the method of stow utilized by the *Toten Maru* was common and that the pipe could be and usually was unloaded safely. However, the Court rejects the nondelegable standard proposed by plaintiff. Pre-amendment cases such as *Mahnich, Lusich, Munson* and *The Etna* all must be read with care, as they often reflect the rationale of the warranty of seaworthiness even when talking in terms of a negligence standard. To adopt the non-delegable duty proposed by plaintiff would be to go beyond the extent of the remedy envisioned by Congress and by thus increasing the longshoreman's remedy upset the careful balance of interests established in this legislation.

■ The primary responsibility for the safety of the longshoreman lies with the stevedoring company. It is in the position best to provide for the safe unloading of the cargo. The stevedoring company is hired for its expertise in handling cargo safely and its personnel make all of the decisions as to how best to conduct the unloading. Plaintiff has failed to introduce any evidence that the vessel could have forced the stevedoring company to use a certain method of unloading, while anyone in the stevedoring company, and any employee, including any longshoreman, can stop the unloading operations if he feels that a dangerous condition exists. Under the facts of this case, the cargo could have been unloaded safely by experienced longshoremen using careful procedures and the proper equipment. Marine Terminals, the stevedoring company, chose not to employ "on-the-spot dunnage" and chose to remove the safety clips from the hooks on the bridle used to unload the pipe. No evidence was offered showing that the defendant had any knowledge of the condition of the stow or the method of unloading, or even that it would have had the authority to change the procedure had it discovered the danger.

Finding no negligence on the part of the vessel or its owners, there is no liability, and hence it is unnecessary to reach the issues of damages. The foregoing constitutes findings of fact and

conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

It is ordered that judgment be entered for defendant, each party to bear its own costs. Defendant will prepare and file on or before November 29, 1974, a judgment approved as to form by plaintiff.