# United States Court of Appeals

## For the First Circuit

No. 11-2503

TERRI TRUCZINSKAS,

Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR, G.D. ARABIA LTD.,
and INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA/AIG,

Respondents.

PETITION FOR REVIEW OF AN ORDER OF
THE BENEFITS REVIEW BOARD

Before

Lynch, <u>Chief Judge</u>,
Boudin, <u>Circuit Judge</u>,
and McConnell, Jr.,[*] <u>District Judge</u>.

<u>Joshua T. Gillelan II</u>, Longshore Claimants Nat'l Law Center,
with whom <u>Donald E. Wallace</u> and <u>MacDonald & Wallace</u> were on brief
for petitioner.
 <u>Roger A. Levy</u> with whom <u>James Ralph</u> and <u>Laughlin, Falbo, Levy
& Moresi, LLP</u> were on brief for respondents G.D. Arabia Ltd., and
Insurance Company of the State of Pennsylvania/AIG.
 <u>Matthew W. Boyle</u>, United States Department of Labor, Office of
the Solicitor, for respondent Director, Office of Workers'
Compensation Programs, United States Department of Labor.

November 20, 2012

---

[*]Of the District of Rhode Island, sitting by designation.

**BOUDIN, <u>Circuit Judge</u>**.  Michael Truczinskas, age 46, was employed until his death by GD Arabia, Ltd. ("GD") as a military trainer in Tabuk, Saudi Arabia.  On the morning of December 5, 2008, according to the testimony of a co-worker, Truczinskas was found inside his villa hanging from a cross-beam with a noose around his neck.  Shortly thereafter, a doctor at a nearby hospital pronounced Truczinskas dead and identified "asphyxiation by hanging" as the cause of death.

Five months later, Michael Truczinskas' widow, Terri Truczinskas, filed a claim for death benefits on behalf of herself and the couple's three children under the Defense Base Act ("DBA"), 42 U.S.C. §§ 1651-1654 (2006).  Pursuant to agency policy and as authorized by statute, the matter was transferred to the district director's office based in Boston, the location closest to Terri Truczinskas' Connecticut home, and adjudicated there.[1]  An administrative law judge ("ALJ") denied Terri Truczinskas' claim on November 18, 2010.  A three-judge panel of the Department of Labor's Benefits Review Board affirmed the ALJ's order on December 13, 2011, with one member of the panel dissenting.

---

[1]U.S. Dep't of Labor, Div. of Longshore & Harbor Workers' Comp., Industry Notice 122 (Sept. 20, 2007) (transfer of new DBA claims to district office within whose jurisdiction the claimant resides).  The district directors have the powers originally assigned to "deputy commissioners" under the relevant statutes discussed below.  20 C.F.R. § 701.301(a)(7) (2012).

Terri Truczinskas now seeks direct review in this court, raising an issue of jurisdiction on which the circuit courts are divided. Terri Truczinskas, GD (and its insurance carrier) and the Department of Labor are all satisfied that we have jurisdiction, but as the parties cannot confer such jurisdiction where it does not exist, we must still address the issue. García-Velázquez v. Frito Lay Snacks Caribbean, 358 F.3d 6, 8 (1st Cir. 2004). It turns out to be a close call even though the sensible result, consistent with Congress' policy, clearly supports our jurisdiction.

When Congress adopted the DBA in 1941, it aimed to provide workers' compensation covering, among others, individuals employed outside the continental United States under contracts with or approved by the federal government. DBA § 1(a)(4)-(5), 42 U.S.C. § 1651(a)(4)-(5). Drawing on the federal model in the already established Longshoremen's and Harbor Workers' Compensation Act (the "Longshore Act," or "LHWCA"), the DBA adopted the earlier act by cross-reference, saying that "[e]xcept as herein modified, the provisions of the [Longshore Act], as amended, shall apply in respect to the injury or death of any employee" within the scope of the DBA. DBA § 1(a), 42 U.S.C. § 1651(a).

In 1941, compensation decisions under the Longshore Act were made by deputy commissioners whose decisions were then initially reviewed by the district court located in the district

-3-

where the injury or death occurred. 33 U.S.C. § 921(b) (1940). But because the harms under the DBA would in many cases occur outside the United States where no district court had jurisdiction, the DBA provided that judicial review of DBA awards should commence "in the United States district court of the judicial district wherein is located the office of the deputy commissioner whose compensation order is involved," DBA § 3(b), 42 U.S.C. § 1653(b).

The "as amended" language in section 1 of the DBA has been regularly read to mean that the DBA would incorporate "not only the version of the [Longshore Act] in force at the time the DBA was enacted, but all subsequent LHWCA amendments as well." E.g., AFIA/CIGNA Worldwide v. Felkner, 930 F.2d 1111, 1113 n.3 (5th Cir.), cert. denied, 502 U.S. 906 (1991). Thus, presumptively a change Congress thinks suitable for the Longshore Act also applies to the DBA, unless otherwise provided in the new Longshore Act amendment. And Congress included no such provision precluding application to the DBA when, in 1972, it amended the Longshore Act to modernize the ordinary scheme for awarding compensation.

Under the 1972 amendments, the district director is empowered to refer cases to an administrative law judge, who then holds a formal hearing and makes the initial decision, subject to further administrative review by a Benefits Review Board.[2] The

---

[2]LHWCA § 19(c)-(d), 33 U.S.C. § 919(c)-(d) (hearings); id. § 921(b), 33 U.S.C. § 921(b) (Benefits Review Board); see also 20 C.F.R. § 702.301 (formal hearing on "genuine dispute of fact or law

Board's decision, in turn, is reviewed not in the district court but instead in the circuit court where the injury occurred. Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub. L. No. 92-576, §§ 14-15, 86 Stat. 1251, 1261 (codified as amended at 33 U.S.C. §§ 919(d), 921(b)-(c)).

This created a tension because the Longshore Act now embodied the increasingly common scheme for judicial review of administrative agency action and the Longshore Act changes presumptively carry over to the DBA, but Congress seemingly overlooked and did not repeal the earlier DBA provision for judicial review of DBA compensation decisions in the local district court. In resolving this tension, the circuit courts are now almost evenly split on whether initial judicial review of DBA awards should be in the district or the circuit court.[3]

This circuit, e.g., Air America, Inc. v. Director, Office of Workers' Compensation Programs, 597 F.2d 773, 775 (1st Cir. 1979), and the Supreme Court, Director, Office of Workers'

_____

which cannot be so disposed informally"); Roberts v. Sea-Land Servs., Inc., 132 S. Ct. 1350, 1355 (2012) (describing process).

[3]Four circuits endorse review by the district court, ITT Base Servs. v. Hickson, 155 F.3d 1272, 1275 (11th Cir. 1998); Lee v. Boeing Co., 123 F.3d 801, 805 (4th Cir. 1997); AIFA/CIGNA Worldwide, 930 F.2d at 1116; Home Indem. Co. v. Stillwell, 597 F.2d 87, 89 (6th Cir.), cert. denied, 444 U.S. 869 (1979), and three by the court of appeals, Serv. Emps. Int'l, Inc. v. Dir., Office of Workers' Comp. Programs, 595 F.3d 447, 452-55 (2d Cir. 2010); Pearce v. Dir., Office of Workers' Comp. Programs (Pearce II), 647 F.2d 716, 720 (7th Cir. 1981); Pearce v. Dir., Office of Workers' Comp. Programs (Pearce I), 603 F.2d 763, 766-71 (9th Cir. 1979).

-5-

<u>Compensation Programs</u> v. <u>Rasmussen</u>, 440 U.S. 29, 35 (1979), have both assumed jurisdiction over appeals of DBA compensation awards after 1972 that never passed through the district court. But in neither these or other like instances did either court pass from assumption to express consideration of jurisdiction, so strictly speaking we are not bound to find jurisdiction in this case. <u>Ariz. Christian Sch. Tuition Org.</u> v. <u>Winn</u>, 131 S. Ct. 1436, 1448 (2011).

Nevertheless, the Defense Base Act can be legitimately read to confer such jurisdiction upon us, and this reading accords with the overall congressional policy reflected in the 1972 Longshore Act amendments. Congress likely gave no thought at all to the wrinkle that concerns us; but, where statutory language permits a given reading and Congress' policy will be fostered by it,[4] we think that reading should prevail--even if, as here, that statutory language would also permit a contrary reading at odds with Congress' statutory policy.

The circuits that insist on district court jurisdiction have done so because they deem this compelled by the original DBA proviso that the Longshore Act, including any subsequent

---

[4]The "main reason" for the 1972 Longshore Act amendments was "to obviate the increased litigation costs and the unwarranted expenditure of court time under the old system." <u>Ramirez</u> v. <u>Toko Kaiun K.K.</u>, 385 F. Supp. 644, 649 (N.D. Cal. 1974); <u>see also</u> <u>Day</u> v. <u>James Marine, Inc.</u>, 518 F.3d 411, 417 (6th Cir. 2008) ("streamlining of the administrative process in 1972"); S. Rep. No. 92-1125, at 4 (1972) ("crowding of court calendars" under pre-1972 Longshore Act).

amendments, applies "[e]xcept as herein modified." Because the DBA did adopt a separate provision for district court review where the compensation decision was made, these circuits see the just quoted "except" language as freezing in amber, and insulating from the 1972 Longshore Act amendments, the entire subject of judicial review of Review Board compensation decisions in DBA cases. See, e.g., Lee v. Boeing Co., 123 F.3d 801, 805 (4th Cir. 1997).

By contrast, the Second Circuit, favoring jurisdiction in the circuit courts, offers a plausible alternative reading. See Serv. Emps. Int'l, Inc. v. Dir., Office of Workers' Comp. Programs, 595 F.3d 447, 452-55 (2d Cir. 2010). Judge Miner pointed out that when Congress initially adopted the Longshore Act scheme for DBA awards in 1941, the statute already provided for review of a deputy commissioner's decisions by the district court; section 3(b) of the DBA did no more than identify for the DBA awards a different venue--the locus of the award (for DBA awards) rather than the locus of the injury (for Longshore Act awards). Id. at 454.

So read, the only thing frozen in amber by the "[e]xcept as herein modified" qualification is the specification of the reviewing court's location; and when Congress decided in 1972 that the proper court initially to review compensation orders should be the circuit rather than the district court, the modification is fully respected by providing that the location of the reviewing court (now circuit rather than district) shall be the one with

-7-

authority where the initial compensation order was filed, as it was here.

This approach maintains, so far as possible, the congruence between the two schemes otherwise conjoined in 1941. And Congress' overall policy intentions can hardly be open to doubt: because a new layer of administrative review is now provided for DBA as well as Longshore Act award decisions and because judicial review will in both cases be on the administrative record, district court review--whether of DBA or Longshore compensation rulings--provides no benefit but merely adds expense and delay in getting around to a circuit court decision. <u>Lee</u>, 123 F.3d at 808 (Hall, J., dissenting).

The obvious efficiency of bypassing the district court likely explains why in this case the claimant, the company and the Department of Labor, while not all agreeing on the merits, all favor direct review jurisdiction in the circuit court. It explains too why this circuit and the Supreme Court found it easy to assume such direct review jurisdiction. In sum, this is <u>a</u> permissible reading as well as the reading that Congress would have wished us to give a complex set of provisions where loose ends are almost unavoidable. If the case had gone to the district court in Boston, our decision here on the merits would be exactly the same but arrive much later.

Turning then to the merits, the Longshore Act requires covered employers to compensate employees and their dependents for any "accidental injury or death arising out of and in the course of employment," as well as any "injury caused by the willful act of a third person directed against an employee because of his employment," LHWCA § 2(2), 33 U.S.C. § 902(2); LHWCA § 9(b)-(d), 33 U.S.C. § 909(b)-(d); see also O'Keeffe v. Smith, Hinchman & Grylls Assocs., Inc., 380 U.S. 359, 360-361 (1965) (application to DBA case).

Section 3(c) of the Longshore Act (which likewise applies to DBA cases, e.g., Eysselinck v. Dir., Office of Workers' Comp. Programs, 392 F. App'x 262, 264 (5th Cir. 2010)), provides that "[n]o compensation shall be payable if the injury was occasioned solely by the intoxication of the employee or by the willful intention of the employee to injure or kill himself or another," 33 U.S.C. § 903(c), although a rebuttable presumption exists that the injury was not due to intoxication or suicide, LHWCA § 20(c)-(d), 33 U.S.C. § 920(c)-(d). Finally, it is enough to connect employment with a suffered harm if the harm arose out of a "zone of special danger" created by "the obligations or conditions of employment."[5]

---

[5]O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 507 (1951) (internal quotation marks omitted). This doctrine too applies to DBA claims, e.g., Gondeck v. Pan Am. World Airways, Inc., 382 U.S. 25, 27-28 (1965); O'Keeffe, 380 U.S. at 362-64. Its precise scope, developed in other cases, remains to be considered

-9-

After filing her claim, Terri Truczinskas established a "prima facie case" by making two required but relatively easy showings: (1) that Michael Truczinskas had sustained "physical harm" and (2) that "conditions existed at work which could have caused the harm." Bath Iron Works Corp. v. Preston, 380 F.3d 597, 605 (1st Cir. 2004) (citation omitted). When the ALJ came to consider Terri Truczinskas' claim for compensation, she easily found that the prima facie case had been established.

Michael Truczinskas was stationed in the northwest region of Saudi Arabia, a country in which terrorists and insurgent groups have carried out attacks against westerners; he lived inside a guarded GD compound; and he never ventured into the city of Tabuk alone because he considered it a "fairly dangerous place to be." Truczinskas' co-workers shared similar safety concerns. This did not require, nor did the ALJ find, evidence that any such dangers had caused Truczinskas' death; it was enough that the dangers existed.

The claimant then enjoyed the benefit of several statutory presumptions, two of which are relevant here:

> -a presumption "[t]hat the claim comes within the provisions of [the Act]," LHWCA § 20(a), 33 U.S.C. § 920(a) (the "section 20(a) presumption"), and

> -a presumption, already noted, "[t]hat the injury was not occasioned by the willful

below.

intention of the injured employee to injure or kill himself or another," LHWCA § 20(d), 33 U.S.C. § 920(d) (the "section 20(d) presumption").

It was then up to GD to identify "substantial evidence" to rebut the statutory presumption of coverage and, to the extent that the employer relied on suicide as a non-covered cause, the statutory presumption against suicide. Bath Iron Works Corp. v. Fields, 599 F.3d 47, 53 (1st Cir. 2010); see also LHWCA § 920, 33 U.S.C. § 920. In this context, "substantial evidence" means "more than a scintilla," but it "certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003) (internal quotation marks omitted); accord Sprague v. Dir., Office of Workers' Comp. Programs, 688 F.2d 862, 865-66 (1st Cir. 1982).

The ALJ found that the presumptions had been rebutted by GD's proffer of evidence that could persuade a reasonable factfinder that Michael Truczinskas had committed suicide. The primary witness for GD was Dieter Wolf, a co-worker of Michael Truczinskas who, like the decedent, lived inside the GD compound in Tabuk. Wolf testified that the GD compound was gated and guarded and that cameras surveilled the outside walls. He also testified that a woman named Cindy Tan often stayed with Michael Truczkinskas at the latter's villa inside the GD compound and that Michael Truczinskas said that "he was in love with her."

-11-

On the evening of December 4, 2008, Wolf hosted a birthday party at his villa for one of his wife's friends; he invited Michael Truczinskas and Cindy Tan to the party, and Michael Truczinskas came over to Wolf's villa around 9 p.m.  According to Wolf, Michael Truczinskas "said hello to everybody right quick, and left" after only 10 or 15 minutes; "he seemed like he was thinking about something," but Wolf did not ask Michael Truczinskas what preoccupied him.

According to Wolf's testimony, Cindy Tan came running to Wolf's villa at 5:30 a.m. the next morning, beat on the door and said that Michael Truczinskas had hanged himself.  Wolf then ran over to Michael Truczinskas' villa and found Truczinskas hanging from a cross-beam with a nylon rope tied around his neck in the shape of a noose, with a chair located nearby, but with his feet on the floor.  According to Wolf, Michael Truczinskas was wearing pink or red toenail polish, women's makeup and a pair of blue sweatpants.[6]

Wolf said that in trying to rescue Michael Truczinskas from a hanging position, he cut himself but ultimately managed to free Truczinskas from the noose.  Wolf said that he then ran to get his car while Cindy Tan attempted to perform CPR on Michael

---

[6]GD also presented the testimony of Christopher Hansen, a GD accountant who assisted in the "pack-out" of Michael Truczinskas' villa following the occupant's death.  Among the items that Hansen said he found at the villa were three women's wigs and women's clothes and underwear.

Truczinskas. Wolf, along with two nurses who had stayed at his villa the previous night and a U.S. Army master sergeant, drove Michael Truczinskas to a hospital six or eight minutes away. A doctor at the hospital pronounced Truczinskas dead shortly afterwards from asphyxiation.

At the presumption-rebuttal stage, the credibility of the witnesses is not in issue, Fields, 599 F.3d at 55; Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs, 137 F.3d 673 (1st Cir. 1998), and the ALJ concluded that GD had rebutted the section 20(a) presumption of coverage and the section 20(d) presumption against suicide. She said that Wolf's testimony as to how he found the employee is evidence which "a reasonable mind might accept as sufficient to support a finding" that the employee's death was the result of suicide. Cf. Fields, 599 F.3d at 55 (employing the quoted language).

Having determined that GD's evidence was sufficiently substantial to rebut the presumptions--which then vanish from the case, Fields, 599 F.3d at 53--the ALJ moved to the third stage of the burden-shifting process, at which the claimant bears the burden of showing by a preponderance of the evidence on a clean slate that the injury is covered under the compensation statute. Id. at 53; United States v. Keller, 38 F.3d 16, 25 (1st Cir. 1994). Taking into account Terri Truczinskas' alternative theories, the ALJ concluded that she had failed to establish coverage.

Terri Truczinskas appealed to the Review Board which, by a 2-1 vote, upheld the denial of compensation. The Review Board agreed that the section 20(a) presumption of coverage had been refuted by GD's proffer; although it did not specifically say that the section 20(d) presumption against suicide had been rebutted, it agreed with the ALJ that the record could support the inference of suicide. And once suicide surfaced as a plausible possible cause of death (although not the only possible cause), the section 20(d) presumption fell out of the case. Del Vecchio v. Bowers, 296 U.S. 280, 286 (1935).

However, the Review Board remained guarded about expressing a definitive judgment on the actual cause of death, concluding that Terri Truczinskas had failed to carry her burden of establishing that her late husband's death resulted from a cause that would be covered under the statute. Put differently, a reasonable factfinder could conclude, based on the record, that Michael Truczinskas' death could be explained by non-covered causes, thus rebutting any presumption and leaving the burden on the claimant, and that none of Terri Truczinskas' suggested hypotheses that might entail coverage had any serious support in the record.

On judicial review of the Benefits Review Board and ALJ decisions, we agree that the denial of coverage was reasonable and supported by the record, O'Keeffe, 380 U.S. at 361-62, and no error

-14-

of law was committed. See Sprague, 688 F.2d at 865 ("it is immaterial that the facts permit diverse inferences as long as those drawn by the ALJ are supported by evidence"). Suicide is one possible explanation for Michael Truczinskas' death, and one other related possible explanation is not entirely speculative and likewise would not give rise to coverage, namely, misadventure.[7] The ALJ said that the cross-dressing activity and the alleged affair with Cindy Tan may have generated "internal conflict," explaining suicide; this same evidence makes the misadventure explanation colorable as well.

We start with the presumption against non-coverage. Although Saudi Arabia may well pose dangers, Michael Truczinskas was in his premises inside an elaborately guarded compound with no indication of any intrusion by outsiders; the incident was reported by his girlfriend; and he was found hanging by Wolf with death later shown to be caused by asphyxiation. Nothing beyond pure speculation inculpates his girlfriend, who according to Wolf's testimony said that Michael Truczinskas had hanged himself. Nor

---

[7]Gillespie v. Gen. Elec. Co., 21 Ben. Rev. Bd. Serv. (MB) 56, 1988 WL 232796, at *1-2 (1988), aff'd mem., 873 F.2d 1433 (1st Cir. 1989) (coverage denial where employee died "while attempting to temporarily asphyxiate himself as part of an autoerotic activity"). Accidental strangulation in the course of pleasure-seeking activities gone awry is not a rare event. See generally Lonergan v. Reliance Std. Life Ins. Co., No. CA 96-11832-PBS, 1997 U.S. Dist. LEXIS 24075, at *2-3 (D. Mass. May 29, 1997) (statistics on autoerotic asphyxiation as cause of death).

would murder by a jealous mistress itself constitute a covered cause.[8]

At this point the two obvious substantial possibilities were two non-covered causes: suicide and misadventure. This was entirely sufficient to counter the presumption against coverage and, as the suicide possibility was a realistic one (and no covered alternative was obvious), to refute that presumption as well. Although the "substantial evidence" test sounds demanding, it merely requires evidence that "<u>could</u> satisfy a reasonable factfinder" that the claimant's injury was attributable to a non-covered cause. <u>Fields</u>, 599 F.3d at 55; <u>see also</u> <u>Bath Iron Works Corp.</u> v. <u>Dir., Office of Workers' Comp. Programs</u>, 137 F.3d at 675 ("ALJ's choice of inferences is to be respected").

If there were any doubt, it is resolved by <u>Del Vecchio</u> v. <u>Bowers</u>, 296 U.S. 280 (1935), reversing the D.C. Circuit in <u>Bowers</u> v. <u>Hoage</u>, 76 F.2d 996 (D.C. Cir. 1935). Bowers, like Truczinskas, was found dead in circumstances that could conceivably suggest suicide ("killed by his own gun held in his own hand" while on his employer's premises where his gun was kept), but without any obvious motive for suicide ("many witnesses testified to his cheerful disposition"). 76 F.2d at 997. The D.C. Circuit

_____

[8]<u>Kirkland</u> v. <u>Dir., Office of Worker's Comp. Programs</u>, No. 90-1267, 1991 U.S. App. LEXIS 2066, at *4-5 (D.C. Cir. Feb. 7, 1991) (per curiam) (DBA does not cover death of employee "murdered by his jealous mistress") (citing <u>Trans-Asia Eng'g Assocs., Inc.</u> v. <u>Reichart</u>, BRB No. 101-73 (Ben. Rev. Bd., June 25, 1973) (slip op.)).

concluded that "the evidence is at least as consistent with accident as with suicide," and accordingly, that the presumption of coverage and the presumption against suicide in 33 U.S.C. § 903 "must turn the scale" in the claimant's favor. Id.

The Supreme Court reversed. It said that the fact that the fatal shot appeared to be self-inflicted admitted two alternatives: "either the decedent accidentally killed himself, or he committed suicide." 296 U.S. at 285. Plainly deeming the latter possibility sufficiently potent, the Court held that the D.C. Circuit had mis-relied upon the statutory presumption against suicide, the "only office" of which is "to control the result where there is an entire lack of competent evidence." Id. at 286. Once countered by a reasonable possibility of suicide, the presumption dropped out of the case entirely, leaving it to be decided on the evidence offered by each side. Id. at 286-87.

Where coverage or non-coverage is to be decided on the merits, the burden of proof to show a covered cause or set of causes by a preponderance of the evidence rests upon the claimant. Dir., Office of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 278 (1994). Here, some evidence presented at the formal hearing weighs against the suicide explanation. Several witnesses testified that Michael Truczinskas was "upbeat" or "very low-key and happy" before his death, and Terri Truczinskas

testified that her husband was planning a trip home and had already begun to purchase Christmas gifts for his family.

But neither suicide nor misadventure is ruled out by the fact that Michael Truczinskas was discovered with his head in a noose but his feet on the floor, nor by the absence of a suicide note, by no means universal in suicide cases,[9] and hardly to be expected if the cause were misadventure. In all events, the probability of a covered cause, as against realistic possibilities plainly present in this case, depends on whether hypothetical possibilities have support in evidence in the case at hand. So far as appears there is <u>no</u> evidence of a covered cause.

To carry her burden and show the denial unreasonable, Terri Truczinskas has offered a number of theories to explain how her husband's death may have had the requisite connection to his work as a military trainer in Tabuk. These include the following:

> -that her husband may have been killed by conservative Muslim vigilantes who were offended by his alleged extramarital affair or alleged cross-dressing;

> -that her husband may have learned that one of his co-workers was involved in arms smuggling or selling military intelligence, that the co-worker may have killed Michael Truczinskas to silence him, and that GD may have been complicit in the cover-up; and

> -that her husband had been investigating "a threat" to Americans in the area and that he

---

[9]<u>See, e.g.</u>, <u>Scanlon</u> v. <u>Harkleroad</u>, 740 F. Supp. 2d 706, 723 (M.D.N.C. 2010) (in cases of suicide, "more common that a suicide note is not left" than that it is).

had "offended the Saudis" in the course of the investigation; and that Michael Truczinskas' death might have been related to this investigation.

But she admits that she has "no evidence" of arms smuggling or espionage or attacks on GD employees by roving vigilantes. She presented testimony from an "expert" in Middle Eastern studies opining that these theories were "not far-fetched," but offering little more. Given the protected environs of the base and lack of evidence, the ALJ and Review Board could not easily have credited all or any of these theories in preference to those positing that Michael Truczinskas had caused his own death, whether deliberately or not.

Terri Truczinskas also relies on the doctrine, already mentioned, that a harm may be covered as employment related if it derives from the employee's presence in a "zone of special danger" but she failed to establish any such derivation here. Neither suicide in the ordinary case, 33 U.S.C. § 903(c), nor harm "resulting from recreational activities that are neither reasonable nor foreseeable," Kalama Servs., Inc. v. Dir., Office of Workers' Comp. Programs, 354 F.3d 1085, 1091-1092 (9th Cir.), cert. denied, 543 U.S. 809 (2004), fall within the scope of the zone-of-special-danger doctrine. See also Gillespie v. Gen. Elec. Co., 21 Ben. Rev. Bd. Serv. (MB) 56, 1988 WL 232796, at *1-2 (1988), aff'd mem., 873 F.3d 1433 (1st Cir. 1989).

The dissenting Review Board member made a number of points, several already discussed, but none undermines the evidence and inferences supporting the majority's conclusion. The dissenter thought (incorrectly, see Swanson, Chamelin, Territo & Taylor, Criminal Investigation 294 (10th ed. 2009)), that the position of Michael Truczinskas's body wholly negated the possibility of suicide; and anyway suicide is not the only plausible non-covered explanation. The dissenter also expressed doubts about Wolf's credibility but not any evidence that seems to us substantial.[10]

Finally, the dissenting member emphasized the fact that the Saudi police still have not closed their investigation into Michael Truczinskas' death; she suggested that this fact "is entitled to determinative weight in this case," as it indicates that the police force was unable to conclude that the death was due to suicide. But the failure of the claim depends not on proof that the death was suicide but on Terri Truczinskas' inability to establish a likely cause of death covered by the DBA.

Michael Truczinskas' early death was a tragedy; and his widow is a sympathetic case for compensation. But the Defense Base Act, like the Longshore Act, "is not the equivalent of health or

---

[10]According to the dissenting judge, "not only have Saudi police interrogated Wolf repeatedly, they have also taken blood samples from him, thereby suggesting questions about his involvement in [Michael Truczinskas]' death." Given that Wolf was first on the scene and had blood on him, this is hardly surprising, and nothing contradicted evidence that he was summoned to the scene after the fatal event.

life insurance," <u>see</u> <u>LeBlanc</u> v. <u>Cooper/T. Smith Stevedoring, Inc.</u>, 130 F.3d 157, 160 (5th Cir. 1997) (quoting <u>McNeelly</u> v. <u>Sheppeard</u>, 89 F.2d 956, 958 (5th Cir. 1937)).  Absent a showing that the employee's injury arose from employment or from a "zone of special danger" related to employment, the DBA provides no coverage.

The petition for review is <u>denied</u>.