# United States Court of Appeals
## For the First Circuit

---

No. 00-1208

BATH IRON WORKS CORPORATION,

Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR,

Respondent.

_____

DONALD E. HUTCHINS,

Intervenor.

---

ON PETITION FOR REVIEW OF A DECISION
OF THE BENEFITS REVIEW BOARD

---

Before

Selya, <u>Circuit Judge</u>,
Coffin and Campbell, <u>Senior Circuit Judges</u>.

---

Stephen Hessert for petitioner.
G. William Higbee, with whom James G. Fongemie was on brief,
for intervenor.
Richard F. van Antwerp, with whom Thomas R. Kelley was on
brief, for Birmingham Fire Insurance Company.

April 5, 2001

**COFFIN, Senior Circuit Judge.** Donald Hutchins, an employee for Bath Iron Works (BIW), was awarded medical benefits in 1991 because of a work-related injury stemming from exposure to asbestos dust and other pulmonary irritants. Birmingham Fire Insurance Company (Birmingham) was ruled to be the responsible carrier. Four years later, Hutchins sought and obtained full disability benefits. At that time, an Administrative Law Judge (ALJ) found that Hutchins had been exposed to additional irritants while BIW was self-insured and therefore shifted responsibility for his payments to BIW. The Benefits Review Board of the Department of Labor (the Board) upheld the decision. The company challenges that ruling, arguing, inter alia, that the ALJ exceeded the scope of his authority in re-assigning the liability and that the record fails to support a finding of new toxic exposure. We affirm the Board's decision.

## I. Background

Hutchins worked as a pipefitter for BIW from 1964 until 1988, when he transferred to the company's planning office because of breathing problems.[1] He filed a claim under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901-950, alleging a gradual injury resulting from

---

[1] Although there is some discrepancy in the record as to the actual date of this transfer, the date is not crucial to our analysis and we therefore need not dwell on its accuracy.

continuing exposure to asbestos and other toxic chemicals. After proceedings before an ALJ and appeals to the Board, he was found to have multiple, work-related lung diseases and was awarded medical benefits. Although BIW had become self-insured just after Hutchins' transfer to the planning department in 1988, there was no evidence presented during the original proceedings that he was exposed to harmful stimuli in his new position. As a result, Birmingham, which had insured BIW during the most recent period of harmful exposure, was assigned full responsibility for Hutchins' payments. See Liberty Mut. Ins. Co. v. Commercial Union Ins. Co., 978 F.2d 750, 751 (1st Cir. 1992)(liability for the effects of an occupational disease falls upon the "last responsible insurer").

Hutchins' health continued to deteriorate, forcing his retirement in May 1995. Shortly thereafter, he filed a claim seeking modification of the earlier benefits award to include disability payments in addition to medical benefits. See 33 U.S.C. § 922 (providing for modification). Based on a deposition of Hutchins taken in September 1995, Birmingham took the position that Hutchins had continued to be exposed to airborne irritants at BIW after he moved to the planning department and that this exposure triggered the disability. Birmingham contended that BIW, now self-insured, should inherit

-4-

the responsibility for Hutchins' compensation as the last responsible insurer.

Birmingham focused in particular on an incident that occurred near the planning office blueprint room on March 15, 1995. According to Hutchins, as he passed by the room, he inhaled a substance that nearly caused him to pass out and required him to receive oxygen. He filled out a company "statement of injury," and was out of work for about two weeks following the episode. Hutchins also testified that he experienced breathing problems in early 1995 because of "a problem . . . with the air conditioning" that caused exhaust fumes to come into his work area.

BIW argued, however, that the earlier ALJ decision conclusively established that Hutchins was last exposed to toxins during Birmingham's period of coverage. It pointed out that Hutchins did not assert a new injury in his request for increased benefits, but simply requested additional compensation based on the change in his condition to total disability. Moreover, BIW asserted that the medical reports in the record failed to support an aggravation or new injury that would warrant a change in liability. The company maintained that Hutchins' disability resulted from a natural progression of his

previously diagnosed lung diseases and that responsibility for compensating him should remain with Birmingham.

The ALJ – not the same one who had presided over the earlier proceedings – sided with Birmingham, finding that Hutchins had experienced additional exposure to "injurious pulmonary stimuli at the shipyard up to and including at least that acute exacerbation on March 15, 1995," when BIW was self-insured. Accordingly, the judge modified the original ruling by awarding Hutchins permanent total disability benefits and shifting responsibility for payments to BIW. The Board affirmed, and this appeal followed. BIW continues to assert both procedural and substantive challenges to the ruling.

Our review of the Board's decision is limited to legal issues, including the question of "whether the Board adhered to the 'substantial evidence' standard when it reviewed the ALJ's factual findings." Bath Iron Works v. Brown, 194 F.3d 1, 3 (1st Cir. 1999); Bath Iron Works v. White, 584 F.2d 569, 573-74 (1st Cir. 1978).

## II. Procedural Issues

Hutchins initiated the second, disability, phase of his LHWCA case by filing a claim for compensation in August 1995. In it, he identified the "date of injury" as May 19, 1988, the date established in the first proceeding by the ALJ who awarded

Hutchins medical benefits. BIW maintains that, because no new injury was alleged, the only question before the ALJ was whether the earlier award should be modified upward to compensate Hutchins for the change in his condition to total disability. In the company's view, there was no basis for reconsidering the previous judgment that Birmingham was the insurer responsible for Hutchins' benefits. BIW argues (1) that the company was unfairly ambushed by the unexpected scope of the proceedings, (2) that the ALJ lacked authority to re-allocate responsibility, and (3) that the ALJ applied an incorrect legal standard in determining liability. We find the company's arguments unpersuasive on each of these issues.

Notice. We previously have taken a pragmatic view of notice requirements under the LHWCA in light of the "liberal construction" enjoyed by the statute. See Bath Iron Works v. Director (Jones), 193 F.3d 27, 31 (1st Cir. 1999). In Jones, we deemed inconsequential the lack of a new injury claim under § 913 of the LHWCA where the employee's letter seeking modification of benefits and the modification proceedings themselves provided timely notice that he was asserting a new injury claim. Id.[2]

---

[2] We noted that Jones' request for an increased benefit necessarily meant that he was asserting either a new injury or aggravation of his prior injury. 193 F.3d at 31.

Similarly here, BIW knew the salient facts from early on: that Hutchins had completed a "statement of injury" form following the March 15, 1995 print room episode and that Birmingham sought to cast off responsibility for Hutchins' payments based on new harmful exposures while BIW was self-insured.[3] The only significant gap was that BIW had no notice of, and did not participate in, Hutchins' deposition in the fall of 1995. Any disadvantage was subsequently remedied, however, when BIW received a transcript of the deposition and was able to cross-examine Hutchins at the hearing before the ALJ. Indeed, the ALJ expressed a willingness to offer additional access to Hutchins before closing the record if BIW argued that it was necessary. In these circumstances, we see no unfairness in the ALJ's and Board's consideration of whether liability for Hutchins' payments should shift to BIW.

Scope of Authority. BIW maintains that, even if the company received adequate notice, the ALJ lacked the authority to re-assign liability for Hutchins' benefits in a § 22 modification proceeding, see 33 U.S.C. § 922, whose purpose it asserts is limited to exploring whether an employee's compensation should

_____

[3] The memorandum of the Informal Conference held on December 12, 1996, nearly a year before the administrative hearing, states that the parties could not agree on the issue of "responsible carrier." BIW and Birmingham were both represented at the conference.

be changed to reflect changes in his health or other circumstances. The company argues that, pursuant to principles of res judicata, the ALJ was bound by the prior administrative determination that Birmingham was the responsible carrier. Our Jones case, 193 F.3d at 29-31, dispenses with this assertion as well. There, as here, the ALJ confronted a claim of new injury in a modification proceeding, such injury was found, and the responsible carrier consequently changed from an insurance company to BIW as a self-insured employer. Id.

That decision was not aberrational. It is well established that traditional notions of res judicata do not govern § 22 modification proceedings, which may be brought whenever "'changed conditions or a mistake in a determination of fact makes such modification desirable in order to render justice under the act,'" O'Keeffe v. Aerojet-General Shipyards, Inc., 404 U.S. 254, 255 (1971) (per curiam) (quoting S. Rep. No. 588, 73d Cong., 2d Sess., 3-4 (1934); H.R. Rep. No. 1244, 73d Cong., 2d Sess., 4 (1934)); see also Banks v. Chicago Grain Trimmers Ass'n, 390 U.S. 459, 465 (1968); Jessee v. Director, OWCP, 5 F.3d 723, 725 (4th Cir. 1993) ("[T]he 'principle of finality' just does not apply to Longshore Act . . . claims as it does in ordinary lawsuits."). The ALJ in considering the record of Hutchins' medical and employment history thus had broad

-9-

discretion to revisit issues already decided and, if appropriate, "to correct mistakes of fact, whether demonstrated by wholly new evidence, cumulative evidence, or merely further reflection on the evidence initially submitted." O'Keeffe, 404 U.S. at 256. As the Board concluded:

> Given the broad scope of modification proceedings, the administrative law judge made no error in considering all issues related to the cause, nature, and extent of claimant's disability, which claimant asserted was the result of a change in claimant's condition. His authority under Section 22 necessarily includes determining which entity should be held liable for claimant's disability.

Board Opinion at 4.[4]

Standard of Liability. BIW also argues that, in shifting responsibility from Birmingham to BIW for Hutchins' benefits, the ALJ and Board misapplied the law governing the allocation of liability in occupational disease cases. A brief review of the relevant principles is a necessary prerequisite to our discussion of BIW's contentions.

---

[4] BIW's attempt to characterize the modification proceeding as a back door route to retrying the case is off the mark. Judge DiNardi, the second ALJ, relied heavily on relevant new evidence that had not been available at the original hearing because it concerned Hutchins' medical condition and work environment in the years since that hearing. Cf. General Dynamics Corp. v. Director, OWCP, 673 F.2d 23, 26 (1st Cir. 1982) (rejecting employer's request to re-open proceedings to litigate a claim it failed to raise earlier because of a legal misjudgment).

The seminal case addressing the assignment of responsibility among several potentially liable employers and insurance carriers is the Second Circuit's <u>Travelers Insurance Co.</u> v. <u>Cardillo</u>, 225 F.2d 137 (2d Cir. 1955).  The <u>Cardillo</u> rule states that

> the employer during the last employment in which the claimant was exposed to injurious stimuli, prior to the date upon which the claimant became aware of the fact that he was suffering from an occupational disease arising naturally out of his employment, should be liable for the full amount of the award . . . and . . . the carrier who last insured the "liable" employer during claimant's tenure of employment, prior to the date claimant became aware of the fact that he was suffering from an occupational disease arising naturally out of his employment, should be held responsible . . . .

<u>Id.</u> at 145.  We have adopted a modified version of this "last injurious exposure" and "last insurer" rule, holding that the date of <u>disability</u>, rather than the date of awareness of disease, is the key to determining the responsible insurer. <u>Liberty Mut.</u>, 978 F.2d at 756.[5]

The importance of the onset of disability also is reflected in provisions of the LHWCA.  Before 1984, an employee's awareness of a relationship between "the injury or death," on the one hand, and the employment, on the other hand, started the

---

[5] Technically, we adopted in <u>Liberty Mutual</u> a revised version only of <u>Cardillo</u>'s last responsible <u>insurer</u> rule because — as here — the parties did not dispute that BIW was the liable employer.  978 F.2d at 754 n.4.

running of the 30-day statutory period for filing claim notices, and claims had to be filed within a year after awareness of "the relationship between the injury or death and the employment." Id. at 754; 33 U.S.C. §§ 912(a), 913(a). Under amendments adopted in 1984, the triggering date for claims for compensation for occupational disease now is the time when "the employee or claimant becomes aware . . . of the relationship between the employment, the disease, and the death or disability." 33 U.S.C. §§ 910(i); 912(a); 913(b)(2). We previously have observed that this change meant "that Congress identified onset of disability – not occurrence of an injury or awareness of an occupational disease – as the critical factor in filing LHWCA claims." Liberty Mut., 978 F.2d at 754 & n.5.

One other principle is at play. Under the so-called "two injury" or "aggravation rule," when an employment injury aggravates, accelerates, or combines with a pre-existing condition to result in a disability, the entire resulting disability is compensable by the insurer liable for the "new" or "aggravating" injury. Foundation Constructors, Inc. v. Director, 950 F.2d 621, 624 (9th Cir. 1991); see also Jones, 193 F.3d at 30-31. If, however, the disability resulted from the natural progression of the prior injury and would have occurred notwithstanding the subsequent injury, then the prior employer

(and its insurer) are responsible. Foundation Constructors, 950 F.2d at 624. This rule is really nothing more than a variation of the last employer rule, and is similarly "designed to determine whether a subsequent employer bore all the liability for disabilities caused by more than one employer," Id. at 623. Although there is some question whether the aggravation rule applies to occupational disease cases, compare id. at 623-24 (opining that it does not), with Jones, 193 F.3d at 31 (assuming applicability of aggravation rule to occupational injury), it often would be superseded in such cases in any event. Under the "last injurious exposure rule," any exposure to harmful stimuli during an insurer's coverage period will lead to liability if the employee becomes disabled during that period by an exposure-caused injury, even if the most recent exposure was not the primary or triggering cause for the disability. See Cardillo, 225 F.2d at 145. Thus, unlike the typical two-injury/aggravation case, in an occupational disease case like this one involving environmental irritants, the insurer on the risk at the time a new injury triggers disability may not defend against liability by arguing that exposures occurring before its coverage period inevitably would have led to the disability.[6]

_____

[6] As we discuss below, the "last injurious exposure rule" is triggered by the onset of disability. Use of the aggravation rule in the occupational disease setting could make a difference

-13-

BIW asserts that the ALJ erred in applying the aggravation rule in this case to find that continuing exposures resulted in a new, compensable injury for which BIW was responsible. It takes the view that, in occupational disease cases, only the "last injurious exposure" rule is applicable, and that once a "last carrier" has been designated as responsible – as Birmingham had been in the earlier proceeding – subsequent exposures are irrelevant in determining liability. BIW insists that, "by definition, there cannot be <u>another</u> 'last' employer" (and accompanying last carrier). Brief at 14 (emphasis in original).

Even if BIW were correct about the inapplicability of the aggravation rule, its argument would be flawed by the assumption that the original ALJ's decision provided a final resolution to the "last carrier" question. As we have discussed, the responsible insurer is the one covering the risk at the last time the employee was exposed to harmful stimuli "<u>prior to the date the claimant became disabled</u>" by his employment-related occupational disease. <u>Liberty Mut.</u>, 978 F.2d at 756 (emphasis

---

when a first injury results in a finding of <u>partial</u> disability and an employee later seeks <u>total</u> disability benefits based on new exposures. Such were the circumstances in <u>Jones</u>. <u>See</u> 193 F.3d at 29 (first ALJ awarded permanent partial disability benefits based on asbestosis and second ALJ found new, aggravating injury from poor ventilation).

added).  The first ALJ's ruling addressed Hutchins' claim that he had experienced an occupational injury and was entitled to medical benefits; Hutchins continued to work until 1995, when he first sought compensation for disability.  Because disability is "the critical factor" in assigning carrier liability, id., the "last carrier" for purposes of disability payments may not be the same "last carrier" responsible for medical benefits.  Id. at 753 n.3; 754-55 & n.6.  Thus, if Hutchins continued to be exposed to harmful airborne substances after BIW became self-insured, and if his lung condition became disabling during that time period, the "last carrier" rule would impose liability on BIW.

The timing of Hutchins' disability was addressed in the administrative proceedings only in the context of the employer's eligibility for relief under § 8 of the LHWCA, 33 U.S.C. § 908(f), which limits an employer's liability for disability benefits to 104 weeks in certain "second injury" cases.[7]  The ALJ ruled that BIW qualified for such relief, finding, inter alia, that Hutchins' earlier exposures "resulted in a permanent partial disability and loss of pulmonary function in 1984 and

_____

[7] Benefits beyond 104 weeks are paid by a special fund, rather than the employer, when the employee's total disability is traceable in part to a prior injury that had caused a permanent partial disability.  33 U.S.C. § 908(f).

1988." That finding, however, does not determine the date of disability for purposes of the last carrier rule. In Liberty Mutual, we held that the date of disability fixing liability among successive insurers under the LHWCA is "the date of decreased earning capacity," 978 F.2d at 759; see also 33 U.S.C. § 902(10) (defining disablement under the LHWCA, in part, as the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment"). Although BIW now argues that Hutchins' transfer from pipefitting work to the planning department is evidence of diminished earning capacity, there is no support for such an inference in the record. To the contrary, the Board explicitly noted in its decision that Hutchins had filed his request for modified benefits "based on a change in his condition from having no loss in wage-earning capacity based on a suitable job in the planning office to permanent total disability based on his inability to continue performing this job." Board Opinion at 4. Cf. White, 584 F.2d at 572 (employee transferred from job as skilled pipecoverer to unskilled position in machine shop).

In these circumstances, the inquiry required under the "aggravation" approach for assigning carrier liability would be superfluous. Because Hutchins' lung condition did not become

-16-

disabling for purposes of carrier liability until 1995, while BIW was self-insured, the shift in liability to BIW turns not on whether any harmful exposures during its coverage period amounted to a new or aggravating injury, but only on whether any such exposures occurred at all. If so, BIW would be responsible as the carrier on the risk during the last period of injurious exposure before Hutchins became disabled by lung disease.

We thus turn to the question of whether the record supports the administrative findings that such exposures did occur. See White, 584 F.2d at 573 ("[I]f supported by the evidence, the inferences drawn by the administrative law judge are conclusive.").

### III. Evidence of Continuing, Harmful Exposure

The question at the heart of this case is whether Hutchins continued to be exposed to harmful inhalants after being assigned to the planning office. The ALJ found that he had, pointing in particular to the reported episode near the blueprint room on March 15, 1995, and also crediting Hutchins' testimony that "bad air" permeated his work area in early 1995 because of a problem with the ventilation system. The Board described the ALJ's conclusions as follows:

> Given claimant's testimony describing additional
> exposure and the medical evidence depicting a highly
> symptomatic condition affected by additional exposure,
> the administrative law judge stated that he "simply

-17-

cannot accept" employer's assertion that claimant was not exposed to harmful stimuli after it became self-insured in 1988. He concluded that claimant's "exposure and inhalation of asbestos and other injurious pulmonary stimuli at the shipyard up to and including at least that acute exacerbation on March 15, 1995[,]" resulted in his economic disability commencing May 31, 1995.

Board Opinion at 5. In concluding that the evidence of record supported the ALJ's findings, the Board noted the judge's reliance on the reports of Drs. Altman, Teel and McArdle, which describe the progression of Hutchins' condition and refer to the same post-1988 exposures to irritants that Hutchins later addressed in his testimony. See supra at 3-4.

Although the ALJ's decision was not inevitable, we are satisfied that the Board did not err in determining that the decision was supported by substantial evidence. Notes from Dr. Teel refer to Hutchins' complaint in early March 1995 of poor ventilation in his office building, and Dr. Altman also reported that Hutchins advised him in June 1991 that his cough was exacerbated by conditions at work. A report in February 1992 from Dr. Teel showed that Hutchins was out of work for two weeks in late 1991 and early 1992, and noted that he was still "bothered by any environmental exposure to inhalants." A BIW health record dated April 11, 1995 documents a telephone call in which Hutchins said that "something in the building bothers him, but he doesn't know what." That an acute episode occurred on

-18-

March 15, 1995 is well supported by the record, which includes reports from BIW's employee health department, the company's injury report, and reports from Dr. Teel and one of his associates on office visits by Hutchins on March 20 and 23.

We recognize that this evidence does not compel the conclusion reached by the ALJ on Hutchins' continuing exposure to irritants, and that other evidence exists to counter it. BIW's "medical encounter form" detailing the March 15, 1995 episode, for example, reported that an investigation of the area near the blueprint room turned up a five-gallon bucket of floor finishing product, but it appeared "tightly sealed." Another equivocal bit of evidence appeared in a June 1991 letter from Dr. Altman to Dr. Teel, in which Dr. Altman observed that Hutchins' recent increased coughing "reflects exposure either in changing to his new office building or to the numerous pollens that have been circulating this spring." It was the ALJ's prerogative in the first instance, however, to draw inferences and make credibility assessments, and we may not disturb his judgment and the Board's endorsement of it so long as the findings are adequately anchored in the record. See Pittman Mech. Contractors, Inc. v. Director, OWCP, 35 F.3d 122, 127 (4th Cir. 1994) (ALJ's findings sometimes may not be disregarded even if other inferences might have been more reasonable); White, 584

F.2d at 573 ("that the facts permit diverse inferences is immaterial"). We find that the record satisfies this burden, and consequently affirm the judgment below.

## IV. <u>Conclusion</u>

Substantial evidence supports the finding of the ALJ, affirmed by the Benefits Review Board, that claimant Hutchins was exposed to harmful industrial irritants during the time BIW was on the risk as a self-insured employer. We further conclude that: (1) BIW had adequate notice of its potential liability, (2) the issue of responsible carrier was properly before the ALJ, and (3) the administrative decisions utilized appropriate standards for assigning liability in occupational disease cases. All prerequisites having been met, the ALJ and Board properly shifted responsibility for Hutchins' benefits from Birmingham to BIW.

<u>The petition for review is denied.</u>